IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

JANE DOE,                                    Case No. 2:23-cv-00332-HL

        Plaintiff,

  v.                                       **OPINION AND ORDER**

BILL WRIGHT, KEITH KENNEDY,
DARLA HUXEL, CITY OF UMATILLA,
AND JOHN DOES 1-10,

        Defendants.

Christopher E. Hayes
Terry Scannell
Law Office of Terry Scannell

Patrick M. Gregg
Corey, Byler & Rew, LLP

        Attorneys for Plaintiff,

Andrew D. Campbell
Heltzel Williams, PC
Lauren E. Nweze
William E. Stabler
David C. Lewis
Lewis, Nweze & Stabler

        Attorneys for Defendants.

_____

HALLMAN, United States Magistrate Judge:

Plaintiff Jane Doe brings this action against the following defendants: (1) Bill Wright ("Wright"), former Detective Sergeant with the Umatilla Police Department ("UPD"); (2) Keith Kennedy ("Kennedy"), UPD Lieutenant; (3) Darla Huxel ("Huxel"), UPD Chief; (4) the City of Umatilla ("City"); and (5) John Does 1-10. (Collectively, "Defendants"). Plaintiff initiated this action on March 8, 2023. ECF 1. On April 14, 2023, she filed the operative pleading, the First Amended Complaint ("FAC"), alleging four causes of action that are discussed in detail below. ECF 8. Wright filed a motion to dismiss ("Wright Mot."), ECF 17; and Kennedy, Huxel, and the City ("Umatilla Defendants") filed a motion to dismiss ("Umatilla Mot."), ECF 18. This Court heard oral argument on the parties' motions to dismiss on July 14, 2023. *See* Tr., ECF 26.

For the reasons discussed below, Wright's Motion to Dismiss is DENIED as to Plaintiff's first claim for relief and GRANTED as to the remaining claims. The Umatilla Defendants' Motion to Dismiss is GRANTED. Plaintiff's first claim for relief against Kennedy, Huxel, and the City is dismissed WITHOUT PREJDICE. Plaintiff's second, third, and fourth claims for relief are dismissed WITH PREJUDICE. Finally, this Court *sua sponte* dismisses the John Doe defendants WITHOUT PREJUDICE.

## PLAINTIFF'S ALLEGATIONS

For purposes of this motion, this Court accepts as true all well-pleaded material facts alleged in the complaint. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018).

Plaintiff is an unidentified eighteen-year-old female. FAC ¶1.[1] In October 2017, when Plaintiff was 13 years old, she began chatting online with a 34-year-old man who was later identified as Michael Wayne Lyon ("Lyon"). FAC ¶15. Lyon initially told Plaintiff that he was 15 years old. *Id*. In the months that followed, Plaintiff learned Lyon's true age and that he lived in Florida. *Id.* at ¶16. Once Plaintiff learned Lyon's true age, she attempted to cut off all contact with him; however, Lyon continued to send inappropriate sexual messages, photos, and threats to Plaintiff. *Id.* at ¶17. In January 2018, Lyon began contacting Plaintiff's brother and one of Plaintiff's friends through social media applications. *Id.* at ¶18. The messages were frequently disturbing and threatening. *Id*. In late March 2018, Lyon flew to Seattle, Washington, rented a car, and drove to Umatilla, Oregon, where he rented a room at a hotel. *Id.* at ¶19. On March 24, 2018, Lyon coerced Plaintiff to come to his hotel room and induced her to perform oral sex on him, videotaped her doing so, and raped her twice. *Id*.

Lyon used his real name and correct birthdate on the car rental paperwork and hotel room reservation. *Id.* at ¶20. He also provided the correct address for his employer. *Id*. On or about March 31, 2018, Lyon sent a copy of the explicit video that he made of Plaintiff in the hotel room to Plaintiff's brother. *Id.* at ¶21. In the following days, Plaintiff's mother and father became aware of the video and Plaintiff's mother received a recording of the video on her phone. *Id*.

---

[1] Plaintiff filed this action under a pseudonym without first seeking leave of the Court. Given the sensitive nature of Plaintiff's allegations and the apparent lack of objection from Defendants, this Court concludes that this is the "unusual case" where when anonymity is necessary "to preserve privacy in a matter of sensitive and highly personal nature." *See Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1067-68 (9th Cir. 2000) (discussing standards). However, this Court must determine whether to allow the Plaintiff to remain anonymous at "each stage of the proceedings." *Id*. Plaintiff should therefore be prepared to make an appropriate record concerning the need for anonymity with respect to further proceedings in this matter.

On or about April 4, 2018, Plaintiff's father took her to UPD. At UPD, Wright spoke to Plaintiff for about ten minutes and took her report of the sexual assault. *Id*. at ¶22. Plaintiff provided a physical description of Lyon and identified him as "Michael Lee". *Id*. at ¶24. Plaintiff described Lyon's rental car and provided information that Lyon was not from the area and had to travel. *Id*. Wright also had a short interview with Plaintiff's father. *Id.* During the interview with Plaintiff's father, Wright questioned why Plaintiff had not come to the police earlier but assured her father that there would be a full investigation. *Id*. at ¶23.

Wright referred Plaintiff to the Guardian Care Center ("GCC"), a local agency in Umatilla County that investigates child abuse. *Id*. at ¶25. Plaintiff met with staff at the GCC, provided information about the sexual assault, and told the interviewer that Lyon had threatened to put a "hit" out on her and her family. *Id*.

On or about April 18, 2018, Plaintiff's mother brought the video of oral sex that Lyon had recorded into the UPD station for Wright to review. *Id*. at ¶26. Plaintiff's mother also emailed a copy of the video to Wright. *Id*. When Plaintiff and her mother met with Wright, he made several comments that made it clear to Plaintiff and her mother that he did not believe Plaintiff's account of Lyon grooming her online, bringing her to the hotel room, raping her, and videotaping her. *Id.* at ¶9. Wright told Plaintiff and her mother, "young girls make stuff up like this all the time." *Id.* Wright also said that he did not believe Plaintiff was telling the whole story because "girls this age withhold information" and it could be that Plaintiff was "just upset at a boy and trying to get back at him." *Id*. at ¶27. Wright explained that he thought Plaintiff seemed too calm and, in his experience, young girls are emotional and upset when reporting sexual assault. *Id*. Wright also expressed his concern that if "UPD were to arrest the wrong man they would be sued"—and he could not take that chance. *Id*. Wright told Plaintiff and her mother that

if they wanted a full investigation, they would need to find Lyon's full name and a clear picture of his face. *Id*. Wright told Plaintiff's mother that if she were a "good mom" she would find a photo and the name of her daughter's abuser. *Id*. at ¶28.

A few weeks later, Wright visited Plaintiff's father at his home. *Id*. at ¶29. Plaintiff's father recounts that Wright came to the house to retrieve the phone that Plaintiff had been using to communicate with Lyon. *Id*. When Wright came to Plaintiff's father's home, Wright assured her father that police had reviewed the security tapes at the hotel, interviewed hotel staff, and were conducting a thorough investigation. *Id*. at ¶30. Wright also told Plaintiff's father that the case was not looking good because it was "[Plaintiff]'s fault for sneaking out and withholding information from the police." *Id*. Wright also informed Plaintiff's father that he did not believe that Plaintiff was ever at the hotel. *Id*.

After Plaintiff reported to Wright that she had been raped, and after Wright asked or instructed her to find Lyon's full name and a clear picture of him, Plaintiff remained in contact with Lyon. *Id*. at ¶39. While Plaintiff remained in contact with Lyon to gather more evidence for UPD, she was forced to endure constant messages containing threats from Lyon as well as sexual advances and obscene photos. *Id*. at ¶40. Plaintiff tried to limit her contact with Lyon, but felt that if she blocked him entirely, she would be unable to gather the evidence that Wright said he required to investigate the crimes against Plaintiff. *Id*. at ¶41. While Plaintiff tried to gather evidence, Lyon made specific and troubling threats on multiple occasions. *Id*. at ¶42. At one point, he texted a photo of the outside of Plaintiff's family home to Plaintiff and threatened to murder her entire family. *Id*. Wright also threatened to take specific and gruesome actions against Plaintiff's sister. *Id*. Plaintiff's father reported the threats to UPD but there was no follow

up with Plaintiff or her family. *Id.* UPD never documented the threatening calls and texts from Lyon, and the harassment was allowed to continue without any police involvement. *Id.*

Sometime between December 2019 and January 2020, Lyon sent Plaintiff a message threatening to kill her and her young child. *Id.* at ¶47. In January 2020, Plaintiff and her mother went back to UPD and spoke with Wright and told him that Lyon threatened to murder Plaintiff, her young child, and other family members. *Id.* at ¶48. Plaintiff also provided Wright with a picture of Lyon, multiple chat threads between him and Plaintiff, and his full name. *Id.* Wright told them that the photo was not helpful because "the man was wearing sunglasses". *Id.* Wright also questioned Plaintiff and her mother asking, "how do we known [Plaintiff] is not still lying? How do we know we are not ruining some guy's life because [Plaintiff] is still mad?" *Id.* at ¶49. Once again, Wright told Plaintiff and her mother that he did not believe that Plaintiff had told the "whole story" and that if Plaintiff were lying and UPD arrested him, Lyon would sue UPD. *Id.*

Plaintiff's mother feared for Plaintiff's life and the life of Plaintiff's daughter and searched for a telephone number for the FBI using Google. *Id.* at ¶50. When Plaintiff's mother called, the FBI immediately opened a case and, "within days or weeks" the FBI secured multiple search warrants for social media platforms, located hotel and car rental invoices from March 2018 with Lyon's name on them, and arrested Lyon. *Id.* at ¶51. In August 2022, Lyon was found guilty of "Using a Minor to Produce Visual Depictions of Sexually Explicit Conduct" and sentenced to twenty-five years in federal prison. *Id.* at ¶52.

During Lyon's criminal trial, Wright testified that he spoke to Plaintiff for "about ten minutes or less" when she first came to UPD to report her sexual assault on April 4, 2018. *Id.* at ¶22. Wright testified that he had retrieved the phone that Plaintiff had used for the previous eight months to communicate with Lyon, ¶32, and collected the windbreaker that Plaintiff was

wearing the night Lyon raped her. *Id.* ¶24. However, Wright did not submit the phone for lab analysis or preserved any data from it, *id.* at ¶32, and he never submitted the windbreaker for a forensic analysis. *Id.* at ¶33. Wright assured Plaintiff's father that police had reviewed the surveillance footage from the hotel where Lyon sexually assaulted Plaintiff. *Id.* at ¶30. In fact, Wright never obtained a copy of the security tapes, and the hotel clerk, not the police, reviewed the tapes. *Id.* at ¶34. Additionally, Wright never subpoenaed or requested search warrants for the smart phone applications or social media platforms that Lyon had used to groom, harass, and threaten Plaintiff, and to distribute the video he made of her performing oral sex on him. *Id.* at ¶35. Wright also failed to ask for or obtain Plaintiff's brother's phone, her sister's phone, or her friend's phone, despite Plaintiff reporting that Lyon had contacted those individuals through social media. *Id.* at ¶36.

In April 2022, UPD received a report that a minor female, "Jane Doe 2", had been sexually assaulted on a school trip to Houston, Texas by an 18-year-old male student. *Id.* at ¶73. After a substantial amount of time passed, UPD assigned Wright to Jane Doe 2's case. *Id.* However, Wright declined to conduct an interview or take a statement until the GCC could conduct an interview of Jane Doe 2. *Id.* Immediately following the GCC interview, Jane Doe 2's parents met with Wright at the UPD station. *Id.* at ¶74. Wright told Jane Doe 2's parents that he had spoken with the Houston Police Department ("HPD"), and he explained that he would conduct an investigation in Umatilla and send his report to HPD, who would then decide whether to prosecute. *Id.*

During that initial conversation, Jane Doe 2's mother also asked Wright to investigate an incident from December 2021 in which the same 18-year-old male student grabbed Jane Doe 2's breast at school but the school refused to do anything. *Id.* at ¶75. Wright replied, "we can look

into that, but what else is there? There is not much there. He didn't break any laws." *Id.* At that

point, Jane Doe 2's father became agitated and said to Wright, "you don't believe these girls." *Id.*

The next month, in May 2022, Wright told Jane Doe 2's mother via email that he had

finished his investigation and sent his report to HPD. *Id.* at ¶76. However, Wright never

interviewed anyone whom Jane Doe 2 knew had been involved in the two sexual assault

incidents that her parents reported to Wright. *Id.* Additionally, Jane Doe 2's mother was unable

to get a copy of Wright's report from UPD or the Umatilla District Attorney's office when she

requested one, and when she reached out to HPD, that agency told her that they "knew nothing"

and had had no contact with UPD about her daughter's case. *Id.* at ¶77. In September 2022, HPD

contacted Jane Doe 2's mother to inform her that they did not receive anything from UPD until

July 2022 and, as a result of UPD handling the investigation so poorly, HPD did not believe they

could bring charges. *Id.*

## LEGAL STANDARD

A Rule of 12(b)(6) motion tests whether there is a cognizable legal theory or sufficient

facts to support a cognizable legal theory. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). To

survive a Rule 12(b)(6) motion, "the complaint must allege 'enough facts to state a claim to

relief that is plausible on its face.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

555). A Rule 12(b)(6) motion to dismiss for failure to state a claim may be granted only when

there is no cognizable legal theory to support the claim or when the complaint lacks sufficient

factual allegations to state a facially plausible claim for relief. *Mollett v. Netflix, Inc.,* 795 F.3d

1062, 1065 (9th Cir. 2015); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041

(9th Cir. 2010).

When evaluating the sufficiency of a complaint's factual allegations, the court must

accept as true all well-pleaded material facts alleged in the complaint and construe them in the

light most favorable to the plaintiff. *Davidson*, 889 F.3d at 971 (citing *Daniels-Hall v. Nat'l*

*Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)); *Dowers v. Nationstar Mortg., LLC*, 852 F.3d

964, 969 (9th Cir. 2017) (citing *Iqbal*, 556 U.S. at 678).

If a complaint fails to state a plausible claim, "[a] district court should grant leave to

amend even if no request to amend the pleading was made, unless it determines that the pleading

could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122,

1130 (9th Cir. 2000) (*en banc*) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995));

*see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in

denying leave to amend when amendment would be futile).

## DISCUSSION

I.     **First Claim: Equal Protection**

In her first claim, brought under § 1983, Plaintiff asserts that each defendant violated her

right to equal protection of the laws by failing to investigate her sexual assault report based on

gender discrimination. FAC ¶¶82-111. Plaintiff specifically alleges that Wright "failed to

conduct a reasonable investigation of [Plaintiff]'s sexual assault claim due to his discriminatory

animus toward minor females[,]" and alleges that Wright made numerous statements that

demonstrate his gender bias. *Id.* ¶86. Plaintiff alleges that "[i]t is inconceivable" that Kennedy

and Huxel, as Wright's supervisors, did not know about Plaintiff's sexual assault report to

Wright or "the consequential mishandling of the case over more than a two-year period by their

subordinate." *Id.* ¶101. Plaintiff alleges that "the City had a duty to ensure their police force was not regularly violating the constitutional rights of young female victims of sexual assault[.]" *Id.* ¶110. Plaintiff alleges that the acts and omissions of all Defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶82-111.

Defendants advance multiple grounds for dismissal of this claim: (1) all defendants argue that Plaintiff has failed to state a claim for relief for a violation of her right to equal protection because she has not alleged that similarly situated individuals were treated differently, Wright Mot. 2-6; Umatilla Mot. 13-18; (2) all defendants argue that they are entitled to qualified immunity, *id.* 28-31; Wright Mot. 13-16; (3) the supervisory defendants argue that Plaintiff failed to allege that they were each personally involved in the deprivation of her rights, Umatilla Mot. 10-13; and (4) the City argues that Plaintiff has failed to allege a pattern or practice of violating equal protection. *Id.* 20-23. Each argument is addressed below.

### A.    Pleading Comparator Evidence

Defendants argue that Plaintiff's equal protection claim fails to state a claim for relief because plaintiff was required to, but did not, plead comparator evidence. Wright Mot. 2-6; Umatilla Mot. 13-18. This Court rejects that argument.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyer v. Doe*, 457 U.S. 202, 216 (1982)). To prevail on an equal protection claim, a plaintiff "must prove the decision makers in his case acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987); *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) ("[t]he central inquiry in any disparate

treatment claim under the Equal Protection Clause is whether a government action was motivated by a discriminatory purpose"). "A plaintiff may establish discriminatory purpose by 'produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way.'" *Id*. (quoting *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016)); *see also Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977) ("[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"). Plaintiffs bringing disparate treatment claims may "point to comparators as circumstantial evidence of unlawful discriminatory intent." *Ballou*, 29 F.4th at 424. However, "a relevant comparator is not an *element* of a disparate treatment claim." *Id.* (emphasis in original).

Here, Plaintiff alleges that "Wright refused to make any attempt at investigating the rape of [Plaintiff] because of the bias he holds against young women." FAC ¶12. To show Wright's alleged "discriminatory animus toward minor females[,]" *id.* at ¶86, Plaintiff cites multiple statements allegedly made by Wright. *See id.* For example, Plaintiff contends that Wright was skeptical when Plaintiff reported that she had been raped and told her mother that "girls this age withhold information"; Wright also speculated that Plaintiff was "just upset at a boy and trying to get back at him." *Id*. Plaintiff further alleges that Wright expressed concerns about "ruining some guy's life" or being sued if an arrest were made based on false accusations, *id.* at ¶49— indicating to Plaintiff that Wright was more concerned about the welfare of an adult male accused of rape than he was about Plaintiff, a young female who was a victim of rape.

At this stage of the proceedings, Defendants do not dispute that Wright's alleged remarks are sexist and indicate discriminatory animus against young, female victims of sexual assault.[2] Nevertheless, Defendants argue that Plaintiff's equal protection claim must be dismissed because Plaintiff "fails to allege that Wright treated a control group (presumably male complainants) better than Plaintiff's class, *i.e.*, reporting female child abuse victims." Wright Mot. 3; Umatilla Mot. 13-19 (similarly arguing that Plaintiff must plead a control group).

The Ninth Circuit unequivocally rejected that argument in *Ballou*. *See* 29 F.4 at 424-25. There, as in this case, the plaintiff alleged that the defendant discriminated against her based on her gender, and the defendant argued "vigorously"—like Defendants here—that, "to state an equal protection claim of any stripe . . . a plaintiff must show that the defendant treated the plaintiff differently from similarly situated individuals[.]" *Id.* at 425. The Ninth Circuit said that the defendant's "account of the requirements for making out an Equal Protection claim" was "profoundly mistaken" and "squarely contrary to both [Ninth Circuit] precedents and to the basic precepts underlying the Equal Protection Clause." *Id.* at 424. The court therefore held that, "[t]he existence of a comparator is not a prerequisite to stating a disparate treatment claim under the Fourteenth Amendment." *Id.* at 426. The court explained that,

---

[2] Courts have held that similar statements indicate a discriminatory intent. *Cf. Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (finding police officer's comment that "he did not blame [the] plaintiff's husband for hitting her, because of the way she was 'carrying on' . . . strongly suggest an intention to treat domestic abuse cases less seriously than other assaults, as well as an animus against abused women"); *see also Sampson v. Fresno Police Officers*, 120CV00322DADSAB, 2021 WL 1060506, at *6 (E.D. Cal. Mar. 19, 2021) (finding police officer's remark that a domestic abuse victim "learned a difficult lesson about choosing the wrong partner" was "misogynistic" because, "just like the officer's comments in *Balistreri*, they speak to a belief that women, through their personal choices, somehow become more deserving of becoming victims of domestic abuse"); *Motley v. Smith*, 15-00905, 2016 WL 3407658, at *8 (E.D. Cal. June 20, 2016) (noting that "[police] officer's decision to allegedly berate [the Plaintiff] and to blame her abuse on her choice of men is tantamount to the misogynistic comments uttered by the police officer in *Balistreri*, *see* 901 F.2d 701").

> comparator evidence in disparate treatment claims can, but need not, be used to support a finding of discriminatory motive. It is not a gatekeeping mechanism essential to a plaintiff's ability to prove that they have been denied equal protection of the laws by being adversely treated on the basis of membership in a protected class.

*Id*. Furthermore, the court noted, "[u]nder [the defendant]'s reading of the Fourteenth Amendment, no plaintiff could state an equal protection claim 'of *any* stripe' without an identical comparator, no matter how strong the direct or circumstantial evidence that the reason the plaintiff was detrimentally treated was her sex." *Id.* (emphasis in original). The court also pointed out that requiring a comparator or control group would mean that,

> had [the plaintiff] presented an audio recording of [the defendant] stating that he was declining to promote [her] specifically because she was a woman, and that, moreover, he would never promote a woman to sergeant, this evidence would not support a disparate treatment claim unless he promoted an identical male comparator.

*Id.* (emphasis in original).

Even prior to *Ballou*, the Ninth Circuit recognized that a plaintiff in an equal protection case alleging purposeful discrimination need not plead and prove that similarly situated members of other groups were treated differently. The plaintiff in *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2005), like Plaintiff in the present action, accused the defendants of intentional discrimination—albeit based on his protected status as an Arab-American and not on gender as Plaintiff asserts here. *Id*. at 1071. In concluding that the plaintiff stated a claim for relief, the Ninth Circuit held that he "need only prove that [the defendants] purposefully [acted] because of [the plaintiff's] race or ethnicity, and not, as in a selective prosecution case, that similarly situated members of other, usually majority, groups were treated differently." *Id.* In reaching this conclusion, *Awabdy* cited a Second Circuit case, *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001). There, the Second Circuit distinguished between claims of selective prosecution

and claims of discriminatory denials of police protection. With regard to the latter, "[s]o long as [the Plaintiffs] allege and establish that the defendants discriminatorily refused to provide police protection because the plaintiffs are Native American, plaintiffs need not allege or establish the disparate treatment of otherwise similarly situated non-Native American individuals." *Id*. In short, it has long been established that a plaintiff bringing an equal protection claim based on the discriminatory denials of police protection need not plead comparator evidence.

Despite this authority, Defendants insist that Ninth Circuit precedent supports their argument that Plaintiff must "identify[] a similarly situated group to serve as a 'control group' [as] the mandatory first step" in her equal protection claim. Wright Mot. 6; Umatilla Mot. 14 (the FAC "contains no factual allegations of discriminatory disparate treatment of similarly situated individuals"). Defendants cite multiple Ninth Circuit cases in support of their argument. *See* Wright Mot. 3-5 (citing *Phommathep v. Cnty. of Tehama*, No. 22-15132, 2023 WL 2400802, at *1 (9th Cir. Mar. 8, 2023); *Gallinger v. Beccera*, 898 F.3d 1012 (9th Cir. 2018); *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Eliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010); *Thornton v. City of St. Helens*, 425 F.3d 1158 (9thCir. 2005); *Freeman v. City of Santa Ana*, 68 F.3d 1180 (9th Cir. 1995)). However, these cases do not stand for the proposition that a plaintiff must allege a control group or comparator to state an equal protection claim.

This Court acknowledges that the cases cited by Defendants consistently state—albeit often as dicta—that a court's "first step" in an equal protection case "is to identify the state's classification of groups" and generally direct courts to then "look for a control group . . . composed of individuals who are similarly situated to those in the classified group[.]" *Gallinger*, 989 F.3d at 1016; *see also Freeman*, 68 F.3d at 1187 (noting that the court's "first step in equal protection analysis is to identify the [defendants'] classification of groups" and then to identify a

"'similarly situated' class against which the plaintiff's class can be compared"); *Brewer*, 855

F.3d at 966 (same); *Thornton*, 425 F.3d at 1166-67 (same); *Phommathep*, 2023 WL 2400802, at

*2 (same). Despite that common language, those cases do not show that Plaintiff is required to

allege a similarly situated control group to plausibly allege that Wright violated her right to equal

protection. The equal protection cases cited by Defendants are distinguishable from the present

action because they involved selective prosecution claims, a class of one theory, or other claims

that allege discrimination in a context that requires comparator evidence.

In *Freeman*, for example, the Ninth Circuit noted that plaintiff's equal protection claim

was based on a theory of "selective prosecution" and explained that, "'[t]o establish

impermissible selective prosecution, [a plaintiff] must show that others similarly situated have

not been prosecuted and that the prosecution is based on an impermissible motive.'" 68 F.3d at

1187 (citations omitted). In *Thornton*, the Ninth Circuit noted that a "class of one" claim is

another type of equal protection claim that requires proof that the plaintiff "has been

intentionally treated differently from others similarly situated[.]" 425 F.3d at 1167 (citing

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002)); *see also N.

Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (noting that a plaintiff may

bring an equal protection claim based "on unique treatment rather than on classification," which

"the Supreme Court has described . . . as a 'class-of-one' claim") (citing *Vill. of Willowbrook v.

Olech*, 528 U.S. 562, 564 (2000)). Here, Plaintiff's equal protection claim alleges intentional

discrimination and is based on neither selective enforcement[3] nor a class of one theory; thus,

*Freeman* and *Thornton* are both inapposite.

---

[3] In his Reply, Wright mischaracterizes Plaintiff's claim as "alleging selective enforcement".
Wright Reply 1, ECF 22. A selective enforcement claim is the same as a selective prosecution
claim and is brought by a party against whom a regulation is enforced; it alleges that police or

Defendants also rely on *Eliot-Park* to support their arguments, but *Eliot-Park* does not hold that comparator evidence is required to state an equal protection claim. *See* 592 F.3d 1003. In *Eliot-Park*, the plaintiff was injured by an intoxicated driver and alleged that responding police officers, who were Micronesian, failed to investigate the incident or arrest the driver because of her Korean race and the Micronesian race of the driver. *Id.* at 1005-06. To show discriminatory motive, the plaintiff did not allege the kind of direct evidence that Plaintiff alleges here. Instead, the plaintiff relied on circumstantial evidence of racial animus, such as the obvious signs of the driver's intoxication, the officers' rude treatment of the plaintiff, and the fact that police officers "fully investigated" another drunk driving accident that occurred on the same evening that involved a Micronesian victim and non-Micronesian driver. *Id.* at 1006. Although the plaintiff offered no direct evidence of discrimination, she "pled facts from which a trier of fact could infer racial discrimination"—and therefore stated an equal protection violation. *Id.* In denying the defendants' motion to dismiss, the Ninth Circuit emphasized that "'[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protections to disfavored persons.'" *Id.* at 1007 (citing *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000)). Thus, *Eliot-Park* illustrates that, "[a] plaintiff may make out a disparate treatment claim by simply producing direct *or* circumstantial evidence demonstrating that a government action was motivated by a

---

other governmental officials enforced a regulation in an inconsistent or selective manner. *See*, *e.g.*, *Armstrong*, 517 U.S. at 457 (alleging that the plaintiffs were prosecuted for drug offenses because they are black); *see also Freeman*, 68 F.3d at 1187 (alleging that police singled out the plaintiff's bar/restaurant for enforcement of local ordinances); *Rosenbaum v. City and Cty. of San Francisco*, 484 F.3d 1142, 1152-53 (9th Cir. 2007) (alleging that police officers "unevenly enforced" a municipal noise ordinance)). Wright, however, correctly points out that selective enforcement claims are a particular type of equal protection claim that requires a plaintiff to identify a similarly situated group. Wright Reply 2 (citing *Rosenbaum*, 484 F.3d 1152-53).

discriminatory purpose." *Ballou*, 29 F.4th at 424 (emphasis added). Defendants' reliance on *Eliot-Park* is therefore misplaced.[4]

In sum, *Ballou*'s holding that, "[t]he existence of a comparator is not a prerequisite to stating a disparate treatment claim under the Fourteenth Amendment[,]" is controlling authority and the cases cited by Defendants do not dictate otherwise. Indeed, "'[Ninth Circuit] precedent makes clear[] [that] the existence of a comparator is only *one* way to survive summary judgment"—or a motion to dismiss—"on a disparate treatment claim.'" *Ballou*, 29 F.4th at 426 (citing *Pac. Shores Props*, 730 F.3d at 1158) (emphasis in original). Therefore, this Court rejects Defendants' argument that Plaintiff must plead comparator evidence to allege an equal protection claim.

## B.    Qualified Immunity

Defendants Wright, Kennedy and Huxel next argue that they are entitled to qualified immunity on Plaintiff's equal protection claim. Wright Mot. 13-16; Umatilla Mot. 30-31. This Court rejects those arguments and concludes that the law was clearly established.

To determine whether a government official is entitled to qualified immunity, courts "courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . .

---

[4] Wright also cites *Gallinger* to no avail. *See* 898 F.3d at 1016. There, the plaintiffs challenged a gun regulation that allowed retired peace officers with a concealed carry weapon ("CCW") permit to carry certain weapons onto school property, but not other CCW permit holders. *Id.* Because the plaintiffs did not allege a suspect classification or violation of a fundamental right, the question was whether the plaintiffs were similarly situated to the retired peace officers, and if so, whether granting CCW rights to peace officers but not the plaintiffs was rationally related to a legitimate state interest. *Id.* Here, in contrast, Plaintiff alleges that Wright intentionally discriminated against her. FAC ¶12. Thus, "[t]he central inquiry . . . is whether an invidious discriminatory purpose was a motivating factor" in Wright's actions—an inquiry that might be *aided* by evidence that a similarly situated group was treated more favorably than Plaintiff, but does not *require* such evidence. *See Ballou*, 29 F.4th at 424.

show the officer's conduct violated a federal right." *Id*. at 655-56 (internal brackets and citations omitted). "The second prong . . . asks whether the right in question was clearly established at the time of the violation." *Id.* at 656. A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (simplified). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "This demanding standard," the Supreme Court has noted, "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The Supreme Court has repeatedly emphasized the importance of faithfully applying these standards consistent with the purposes of qualified immunity." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

"Qualified immunity is an affirmative defense that must be raised by a defendant." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)). The Supreme Court has emphasized that the issue of qualified immunity be decided "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (simplified). However, the Ninth Circuit recently instructed that the issue is one not generally resolved on a motion to dismiss. *See Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018) (denying motion to dismiss on basis of qualified immunity and noting that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making"). In deciding qualified immunity on a motion to dismiss, "[i]f the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Id*.

at 1235 (citing *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)).

Defendants Wright, Kennedy and Huxel argue that they are entitled to qualified immunity on Plaintiff's equal protection claim because no legal precedent put them on notice that the failure "to undertake an appropriate investigation" amounted to a constitutional violation. Wright Mot. 15. However, Plaintiff does not allege that she has a constitutional right to an appropriate police investigation. *Accord Eliot-Park* 592 F.3d at 1006 (rejecting the defendants' framing of the right at issue as whether "individuals . . . have a constitutional right to have police arrest others who have victimized them."). Instead, Plaintiff alleges that Wright violated her constitutional right to be free from discriminatory police services. Thus, the relevant question is whether it was clearly established that it is unconstitutional for a police officer to fail to investigate a report of sexual assault because of the gender of the victim. This Court concludes that it was.

In *Est. of Macias*, the plaintiffs alleged that police failed to provide protection to a victim of domestic violence "on account of her status as a woman, a Latina, and a victim of domestic violence." 219 F.3d at 1019. There, the Ninth Circuit noted that there is no right "to be protected by the state against being murdered by criminals or madmen," but emphasized that "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." *Id.* at 1028 (citing *Navarro v. Block*, 72 F.3d 712, 715-717 (9th Cir. 1995)). In *Navarro*, the relatives of a domestic violence victim alleged that police failed to assist the victim based on gender discrimination. 72 F.3d at 713. Although the plaintiffs in *Navarro* failed to offer evidence of discrimination, the court acknowledged that a plaintiff may state an equal protection violation

where she alleges that police were gender biased and alleges facts from which a trier of fact

could infer such bias. *Id.* at 716 (citing *Balistreri*, 901 F.2d at 700-01). In *Balistreri*, the plaintiff

alleged that the police failed to protect her from her abusive spouse and alleged facts in her

complaint and response that showed the defendants' discriminatory animus toward women. *Id.*

The Ninth Circuit therefore reversed the dismissal of the plaintiff's equal protection claim and

remanded the claim with instructions to the district court to allow the plaintiff to amend her

complaint. *Id.*

 Additionally, in *Eliot-Park*, the plaintiff alleged that police officers failed to investigate a

crime in which she was a victim due to her race. 592 F.3d at 1007. The defendants argued that

they were entitled to qualified immunity, but the Ninth Circuit disagreed, stating that, "[t]he right

to non-discriminatory administrative of protective services is clearly established." *Id.* at 1008

(citing *Flores v. Pierce*, 617 F.2d 1386 (9th Cir. 1980); *Flores v. Morgan Hill Unified School

District*, 324 F.3d 1130, 1136-38 (9th Cir. 2003)).[5] As the Ninth Circuit emphasized, whether a

police officer's discriminatory animus is based on race, as the plaintiff alleged in *Eliot-Park*, or

gender, as the plaintiff alleged in *Est. of Macias*—and as Plaintiff alleges here—it is beyond

debate that "'[t]here is a constitutional right . . . to have police services administered in a

nondiscriminatory manner[.]'" *Eliot-Park*, 219 F.3d at 1028 (citing *Est. of Macias*, 219 F.3d at

---

[5] In *Pierce*, two Mexican-American plaintiffs alleged that the city denied them a liquor license
based on their race or national origin, and the court held that the defendants were not entitled to
qualified immunity. *See* 617 F.2d at 1388. In *Morgan Hill*, the court denied qualified immunity
to school officials who failed to investigate complaints of anti-gay bullying brought by a gay
student. *See* 324 F.3d at 1135-36. Although *Pierce* and *Morgan Hill* did not involve allegations
of discriminatory police services, the *Eliot-Park* court relied on both cases in finding that "[i]t's
been long established that state employees can't treat individuals differently on the basis of their
race." 592 F.3d at 1009. The court noted that it is unnecessary to find factually analogous cases
in determining qualified immunity in equal protection cases because "the non-discrimination
principle is so clear." *Id.* (citation omitted).

1028; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause")). As the court further emphasized in *Eliot-Park*, "'[t]he constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.'" 592 F.3d at 1008-09 (citing *Pierce,* 617 F.2d at 1392).

Based on this clearly established law, Defendants had ample warning that a police officer may not deny any protective services to anyone based on any discriminatory motive—including gender. Thus, Defendants are not entitled to qualified immunity at this stage of the proceedings.

## C. Supervisory Liability: Kennedy and Huxel

Kennedy and Huxel, who are named as supervisors, argue that they cannot be liable under section 1983 for the alleged deprivation of Plaintiff's equal protection rights because Plaintiff has failed to plead that they were personally involved in the alleged deprivation of her rights. Umatilla Mot. 10-13. This Court agrees.

For a person acting under color of state law to be liable under section 1983 "there must be a showing of personal participation in the alleged rights deprivation: there is no *respondeat superior* liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Because vicarious liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. A supervisory official may be held liable under § 1983 only "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v.*

*Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal quotation marks omitted)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id*. at 1207–08 (citations omitted). Stated another way, "'[a] supervisor may liable under § 1983 for a subordinate's constitutional violations 'if the supervisor . . . knew of the violations and failed to act to prevent them.'" *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

Here, Plaintiff does not allege that either Kennedy or Huxel personally participated in the alleged deprivation of Plaintiff's rights. Rather, Plaintiff argues that it is "inconceivable that, as supervisors, Lt. Kennedy and Chief Huxel did not know of a reported sexual assault of a minor by an unknown out-of-state actor with video evidence and the consequential mishandling of the case over more than a two year period by their subordinate." Resp. ¶101. Plaintiff also argues that Kennedy and Huxel failed to "ensure [Plaintiff] was afforded her rights under the [Fourteenth] Amendment of the United States Constitution[,]" FAC ¶57.

Even assuming that Kennedy and Huxel were aware that Plaintiff had reported sexual assault to Wright and knew about Wright's "mishandling" of the case, however, that does not create supervisory liability under section 1983. Wright may have performed a substandard investigation, and Kennedy and Huxel may have neglected their supervisory duties by failing to "oversee" Wright's investigation, Resp. 28, but neither situation violates the constitution. Rather, it is Wright's alleged *intentional discrimination* that violated Plaintiff's constitutional rights, and there are no allegations that Kennedy or Huxel knew of or acquiesced to that intentional discrimination. Plaintiff also fails to allege that either Kennedy or Huxel knew that Wright made

sexist comments to Plaintiff or had any other reason to believe that Wright failed to investigate Plaintiff's report of being raped because of his alleged bias against young females like Plaintiff.

Plaintiff cites Ninth Circuit cases in which supervisors were held liable under section 1983 for the unconstitutional acts of their subordinates even where, like here, there was no evidence that the supervisor had personally participated in the deprivation of the plaintiff's rights. *See* Resp. 30 (citing *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012); *Maxwell*, 708 F.3d at 1086). In those cases, however, the Ninth Circuit held that the supervisors could be liable based on specific and clear allegations that they knew of the alleged violations. In *OSU Student Alliance*, the Ninth Circuit held that the plaintiffs stated a section 1983 claim against a university president and vice president where it was uncontested that they "oversaw [the] . . . decision-making process and knowingly acquiesced in [the] ultimate decision" that allegedly violated the constitution. 699 F.3d at 1070. There, the Ninth Circuit noted that the supervisory defendants "knew that their subordinate . . . was applying the previously unannounced and unenforced policy" in an allegedly unconstitutional manner and "did nothing to stop him." *Id.* at 1071. The court therefore held that the complaint stated a claim against the supervisors. *Id.* at 1075. In *Maxwell*, the Ninth Circuit held that police supervisors could be held liable under section 1983 for the unconstitutional acts of their subordinate where it was alleged that police supervisors "witnessed at least part of [the plaintiff]'s [allegedly unconstitutional] arrest and beating" and failed to intervene. 708 F.3d at 1081. In this case, there are no allegations that either Kennedy or Huxel knew of Wright's intentional discrimination and failed to take action.

Because Plaintiff has failed to allege facts sufficient to plausibly demonstrate that either Kennedy or Huxel "participated in or directed the violations, or knew of the violations and failed

to act to prevent them[,]" *Maxwell*, 708 F.3d at 1086, Plaintiff has failed to state a claim that

Kennedy and Huxel through their own actions, violated her right to equal protection. Plaintiff's

equal protection claim against Kennedy and Huxel is therefore dismissed. Because it is possible

that amendment could cure this deficiency, this dismissal is without prejudice and with leave to

amend. *Lopez*, 203 F.3d at 1130.[6]

### D.    *Monell* Liability: The City of Umatilla

The City argues it cannot be held liable under section 1983 because Plaintiff has failed to

allege with sufficient clarity or specificity that the City had a longstanding practice or custom

that caused the alleged violation of Plaintiff's rights. Umatilla Mot. at 19-23. Again, this Court

agrees.

Under the Supreme Court's holding in *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S.

658 (1978), a municipal entity may be held liable under § 1983 where a plaintiff demonstrates

that the constitutional violation complained of was caused by a municipal "policy or custom."

436 U.S. at 694. To establish *Monell* liability, a plaintiff must allege that (1) she was deprived of

a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy,

custom, or practice amounted to deliberate indifference of the plaintiff's constitutional rights;

and (4) the policy, custom, or practice was the "moving force" behind the constitutional

violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (simplified).

A "policy" is a "deliberate choice to follow a course of action . . . made from among

various alternatives by the official or officials responsible for establishing final policy with

---

[6] In addition to moving to dismiss each of Plaintiff's individual claims, Kennedy and Huxel
moved to dismiss Plaintiff's claims for punitive damages. Umatilla Mot 28-29. Given this
Court's disposition of the claims against the Umatilla defendants, it is unnecessary to consider
whether Plaintiff has stated a claim for punitive damages.

respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). A "custom" is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *L.A. Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled . . . policy.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). However, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918.

Construing the FAC liberally, Plaintiff's allegations indicate that she seeks to hold the City liable based on Wright's allegedly discriminatory actions in two sexual assault cases—hers and Jane Doe 2's—but she fails to plead with sufficient particularity that the City had a practice or custom that caused the alleged violation of her rights. In the FAC, Plaintiff asserts that the City had a "practice of willful blindness and a complete lack of oversight", *id.* ¶109, but even assuming the truth of that statement, a broad allegation of "willful blindness" is not equivalent to alleging that the City had a practice or custom of discriminating against victims of sexual assault based on their gender. In her response, Plaintiff argues that "[a] policy or custom can be shown . . . because the City took no steps to reprimand . . . Wright or anyone at UPD and failed to make any changes to prevent UPD officers from violating other citizens' equal rights", *id.* at 32, but that does not cure Plaintiff's failure to plead that the City maintained an unofficial policy of not investigating sexual assaults of young, female victims.

To the extent Plaintiff seeks to hold the City liable for the alleged violation of her rights based on a failure to train or supervise, her allegations are also insufficient. *See* FAC ¶110 (alleging that "the City has not implemented new training or oversight protocols for female sexual assault victims"). Failure to train or supervise can lead to *Monell* liability only where the training or supervision is sufficiently inadequate to constitute "deliberate indifference" to citizens' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (failure to train); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (failure to supervise). Deliberate indifference is "a stringent standard of fault" requiring proof that a government actor or entity disregarded a "known or obvious consequence" of its action or inaction. *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). Furthermore, to establish municipal liability based on a failure to train, "there must be a widespread practice[,]" *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012), and "a showing that a single employee was inadequately trained" is not sufficient to show such a practice. *Id.*

To be sure, Plaintiff alleges that the City knew or should have known that Wright failed to investigate Plaintiff's sexual assault and Jane Doe 2's sexual assault but "chose[] to do nothing"—including failing to reprimand Wright or provide him with adequate training. *See* FAC ¶¶109-110. However, the Supreme Court has noted that "a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference[,]" *Connick v. Thompson*, 563 U.S. 51, 62 (2011), and, under Ninth Circuit precedent, alleging that "a single employee was inadequately trained" is not sufficient to show a "widespread practice" of constitutional violations. *Marsh*, 680 F.3d at 1159; *see also*, *Hyer v. City & Cnty. of Honolulu*, 19-00586, 2020 WL 7038953, at *10 (D. Haw. Nov. 30, 2020) (noting

that "[a] pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for failure to train") (citing *Connick*, 563 U.S. at 62)). Plaintiff fails to allege a "widespread practice" of discriminatory actions or "a pattern of similar constitutional violations" by multiple employees. Thus, Plaintiff has failed to allege that the City was deliberately indifferent based on a failure to train. *See Connick*, 563 U.S. at 62; *see also*, *Marsh*, 680 F.3d at 1159.

In sum, Plaintiff has not stated an equal protection claim against the City because she has failed to plead with particularly that the City had a custom or practice to discriminate against female victims of sexual assault or that the City failed to properly train based on "widespread" constitutional violations. Plaintiff's equal protection claim against the City is therefore dismissed. Because it is possible that amendment could cure these deficiencies, this dismissal is without prejudice and with leave to amend. *Lopez*, 203 F.3d at 1130.

## II.     Second Claim: Substantive Due Process

In her second claim, also brought under § 1983, Plaintiff asserts that Wright, Huxel and Kennedy violated her substantive due process rights by telling her to obtain Lyon's full name and a photograph of him. FAC ¶¶82-119. Specifically, she alleges that "Wright placed [Plaintiff] in more danger by insisting that she, a thirteen-year-old female victim of sexual abuse, investigate her own abuser, which necessarily required more contact with him and placed her in greater danger." FAC ¶117. Plaintiff further alleges that, when Wright "instructed [Plaintiff] to find [Lyon's] full name and a better photo, it is foreseeable that [Plaintiff] would suffer tremendous physical and emotional pain." *Id.* Plaintiff's claim is based on the substantive component of the Due Process Clause of the Fourteenth Amendment and, more specifically, the state created danger doctrine, *see* FAC ¶¶112-19; Tr. 28.

Wright, Huxel, and Kennedy advance multiple grounds for dismissal of Plaintiff's due process claim: (1) all defendants argue that Plaintiff fails to allege facts to support the "special relationship exception" and fails to allege that Wright engaged in affirmative conduct that endangered Plaintiff or that she suffered physical harm, Wright Mot. 7-9; (2) Huxel and Kennedy argue that Plaintiff fails to allege facts showing their personal participation in the alleged due process violations, Umatilla Mot. 24-25; and (3) all defendants argue that they are entitled to qualified immunity. *See id.* at 28-31; Wright Mot. 13-16. Given this Court's conclusion that the right at issue is not clearly established, this Court only considers the qualified immunity argument.

The Due Process Clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "'is a limitation on state action rather than a guarantee of minimum levels of state protections, so the state's failure to prevent acts of private parties is typically insufficient to establish liability under the Due Process Clause.'" *Murguia v. Langdon*, 61 F.4th 1096, 1107 (9th Cir. 2023) (quoting *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019)). However, as the Ninth Circuit explained in *Murguia*, "this circuit has recognized two exceptions to this rule: (1) when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger (the state-created danger exception); and (2) when a special relationship exists between the plaintiff and the state (the special-relationship exception)." *Id.* (citing *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011)).[7]

---

[7] In her Response, Plaintiff concedes that "she did not allege that she had a "special relationship" with Defendants for the purpose of her due process claim. Resp. 34, ECF 21. Thus, Plaintiff bases her substantive due process claim on the state-created danger exception alone.

The state-created danger exception has its origins in *DeShaney*, 489 U.S. at 195–96. In *DeShaney*, the Supreme Court held that social workers and local officials were not liable under § 1983 on a failure-to-act theory for injuries inflicted on a child by his father. *Id*. at 191. The state actors had received complaints that the child was abused by his father but failed to remove the child from his father's custody. *Id*. The court reasoned that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id*. at 201. The court acknowledged that the state once took temporary custody of the child and then returned him to his father, but reasoned that the state "placed [the child] in no worse position than that in which he would have been had it not acted at all[.]" *Id*. Given that the state actors did not create or enhance any danger to the child, the state did not have a constitutional duty to protect him from the private violence inflicted by his father. *Id*.

The Ninth Circuit "'ha[s] interpreted *DeShaney* to mean that if affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983.'" *Murguia*, 61 F.4th at 1111 (quoting *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)). The state-created danger exception or 'doctrine' has two requirements. "First, the [doctrine] applies only where there is 'affirmative conduct on the part of the state in placing the plaintiff in danger.' Second, the [doctrine] applies only where the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 974 (simplified) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

This Court declines to consider whether Plaintiff's allegations are sufficient to state a due process claim. *See Patel*, 648 F.3d at 974 (noting the elements of a substantive due process claim

based on the state-created danger exception). Rather, this Court addresses whether it was "clearly established" that Wright's actions were unlawful. *See C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 986 (9th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)) (noting that a qualified immunity analysis may first address whether the asserted right was clearly established—particularly where "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right'").

Again, a clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664. In a qualified immunity analysis, the plaintiff "bears the burden of showing that the right at issue was clearly established." *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011). This Court finds that, at the time the events allegedly occurred in 2018, it was not clearly established that a police officer violates the constitution when he asks or instructs a young, female rape victim to gather additional evidence about her rapist. Although the Ninth Circuit has recognized state-created danger claims in the general context of interactions between police officers and criminal complainants, there is no clearly established law holding that a police officer acts unconstitutionally by asking or instructing a victim of a violent crime to gather information about her assailant.

The Ninth Circuit first recognized the state-created danger exception in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989), a case that involved the police arresting the driver of a vehicle, impounding the vehicle, and abandoning the passenger of the vehicle in a high crime area where she was subsequently raped. *Id.* at 586. After *Wood*, the Ninth Circuit recognized a state-created danger claim in *Grubbs,* 974 F.2d 119 (9th Cir. 1992). In *Grubbs*, the plaintiff was a registered nurse who was assaulted and raped by an inmate in a prison medical clinic. *Id.* at

120. The plaintiff alleged that her supervisor assigned her to work alone with the inmate despite knowing the inmate's history of sexual violence and despite telling the plaintiff that she would not be working unsupervised with violent sex offenders. *Id.* at 121. The Ninth Circuit found that the supervisor "enhanced [the plaintiff]'s vulnerability to attack by misrepresenting to her the risks attending her work," and held that the plaintiff stated a due process violation under the state-created danger doctrine. *Id.*

The Ninth Circuit has also recognized state-created danger claims based on actions taken by police officers responding to reports of criminal activity. *See e.g., Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006); *see also Martinez*, 943 F.3d at 1260. Although the plaintiffs in *Kennedy* and *Martinez* were criminal complainants like Plaintiff in the present case, the police conduct at issue in *Kennedy* and *Martinez* was different from Wright's alleged actions and would not have made it clear to a reasonable officer in Wright's position that his conduct was unlawful.

In *Kennedy*, the plaintiff brought a state-created danger claim against a police officer when she and her husband were shot by teenager whom the plaintiff had accused of molesting her daughter. *See* 439 F.3d 1055. When the plaintiff initially called the police, she described the teenager's long history of violent acts and specifically requested that the police officer notify her before informing the teenager of the plaintiff's accusations, and the officer promised that he would notify her. *Id.* Weeks later, the police officer informed the teenager's mother of the plaintiff's allegations, notified the plaintiff about 15 minutes later, and promised to patrol the area around the plaintiff's home and keep an eye on the teenager. *Id.* That evening, the teenager broke into the plaintiff's home and shot her and her husband while they slept, killing her husband and seriously injuring the plaintiff. *Id.* The Ninth Circuit held that the officer violated the

plaintiff's due process rights by revealing the existence of the allegations to the teenager's mother without notifying the plaintiff as promised and offering the plaintiff false assurances that the police would patrol her neighborhood on the night of the shooting. *Id.*

The Ninth Circuit also held that the police officer in *Kennedy* was not entitled to qualified immunity. *Id.* In denying the police officer qualified immunity, the court cited multiple state-created danger cases, including *Wood*, 879 F.2d 583, but it relied specifically on *Grubbs*, 974 F.2d 119, because the prison supervisor in *Grubbs*, like the police officer in *Kennedy*, made affirmative representations to the plaintiff that the plaintiff then relied upon to her detriment. The *Kennedy* court noted that, "in both cases the plaintiff relied upon the state actor's representation and did not take protective measures she otherwise would have taken, and the state's action made plaintiffs vulnerable to a particularized danger they would not have faced but for that action." *Id.* at 1067. Because the plaintiff's claim in *Kennedy* was "exactly like" the nurse's claim in *Grubbs*—"i.e., that a state actor 'enhanced [her] vulnerability to attack by misrepresenting to her the risks' she faced"—the court found that the defendant was not entitled to qualified immunity. *Id.*

In *Martinez*, the Ninth Circuit found that the plaintiff alleged a state-created danger claim based on how police responded to her calls for emergency help, but the court dismissed her claim based on qualified immunity. *See* 943 F.3d at 1276-77. In *Martinez*, the plaintiff alleged that she called 911 multiple times to report domestic abuse and that police officers responded by informing the suspect of the plaintiff's accusations, making disparaging remarks about the plaintiff to the suspect, praising the suspect and his family, and failing to arrest the suspect. *Id.* at 1266-69. Under those facts, the Ninth Circuit found that the police officers' remarks may have "provoked" the suspect and "emboldened" him to believe that he could further abuse the

plaintiff. *Id.* at 1272. Although the court held that a reasonable jury could find that the officers violated the plaintiff's due process rights by "affirmatively increasing the known and obvious danger" the plaintiff faced, the court granted the police officers qualified immunity because "the application of the state-created danger doctrine" to the context presented by the plaintiff's allegations "was not apparent to every reasonable officer at the time the conduct occurred[.]" *Id.* However, the Ninth Circuit emphasized, "[g]oing forward, the law in this circuit will be clearly established that such conduct is unconstitutional." *Id.*

In contrast, Plaintiff's due process claim does not involve a report of domestic violence, and it does not allege the kinds of statements that police officers made to the man accused of domestic violence in *Martinez*, *see id.* Plaintiff's claim is also not based on the kind of misrepresentations that were made by state actors in *Grubbs* and *Kennedy* that the plaintiffs then relied upon to their detriment. Instead, Plaintiff's claim alleges that Wright endangered her and violated her right to due process by asking her to find Lyon's full name and a clear photo of him. FAC ¶98. Thus, neither *Kennedy* or *Martinez* would have given Wright fair warning that his conduct was unconstitutional. Because this Court is not aware of any case in which a court has held that a police officer violates the constitution by asking or instructing a rape victim to investigate her own rape in the manner that Plaintiff alleges, this Court finds that it was not clearly established that Wright's actions were unlawful.[8]

---

[8] In addition, it is not clear at what point, if any, law enforcement would act unconstitutionally when requesting that a child sexual assault victim obtain information about her abuser. For instance, law enforcement agencies can utilize pretext calls—calls made by the victim to the alleged perpetrator that are monitored by law enforcement—in some sexual assault investigations. *Cf. State v. Inman*, 275 Or. App. 920, 923 (2015) (discussing pretext call made by eleven-year-old sexual assault victim to her abuser, despite the officer's admission that they "'kind of felt bad while [they] were doing it,' but he believed that the pretext call 'was necessary to try to get as much evidence as we could.'"). Such calls further involve the victim in the investigation and could potentially cause further emotional harm to the victim. But they may be a

In conclusion, it is not clear that "every reasonable official," *Reichle*, 566 U.S. at 664, would have understood that Wright violated the law by asking Plaintiff, a child victim of rape, to obtain further information about her rapist. Thus, Wright, Kennedy, and Huxel are entitled to qualified immunity on Plaintiff's due process claim "and cannot be held liable for damages." *C.F. ex rel. Farnan*, 654 F.3d at 986. Moreover, because the qualified immunity issue cannot "possibly be cured by the allegation of other facts," *see Lopez*, 203 F.3d at 1130, Plaintiff's substantive due process claims are dismissed with prejudice.

## III.    Third Claim: Negligence *Per Se*

In her third claim for relief, Plaintiff alleges a negligence *per se* claim. *See id.* at ¶¶120-128. Defendants moved to dismiss that claim and, in response, plaintiff "concede[d] her negligence *per se* claim[.]" Resp. 9. That claim is therefore dismissed with prejudice.

## IV.    Fourth Claim: Negligence

In her fourth claim for relief, Plaintiff asserts a state law claim for negligence, alleging that both Wright and the City were negligent in multiple respects relating to the investigation of the crimes against her. FAC ¶¶120-36. In their motions, Wright and the City argue that Plaintiff has failed to state a negligence claim under Oregon's "economic loss doctrine" because Plaintiff alleges economic damages but fails to allege a physical injury or that a "special relationship" existed between Wright and Plaintiff that is recognized under Oregon law for purposes of the economic loss doctrine. Wright Mot. 11-13; Umatilla Mot. 32-34. This Court agrees with Defendants.

---

necessary law enforcement tool in some investigations. To be sure, the facts pleaded in the complaint do not suggest that Wright was employing legitimate law enforcement tools. Nevertheless, there is no law discussing—much less establishing—when involving the victim of sexual abuse in her own investigation goes beyond a legitimate law enforcement practice and instead violates the victim's due process rights.

Under the economic loss doctrine in Oregon, "one is not ordinarily liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Or. 281, 284 (1987); *see also White v. United Heritage Prop. & Cas. Co.*, 21-1524, 2023 WL 2526137, at *11 (D. Or. March 23, 2023), *report and recommendation adopted*, 2023 WL 2611152 (D. Or. Mar. 23, 2023) (noting that, under Oregon law, a plaintiff can recover "for emotional distress caused by ordinary negligence, but only if the distress is accompanied by physical impact" (citing *Lowe v. Philip Morris USA, Inc.*, 207 Or. App. 532, 551 (2006)). While neither the Oregon Supreme Court nor the Oregon Court of Appeals "have sought to define the minimum amount of bodily harm necessary to constitute a physical impact," it is well-settled that this rule requires at least "an act or omission that results in some perceptible physical effect on a plaintiff." *Chouinard v. Health Ventures*, 179 Or. App. 507, 515 (2002) (citations omitted); *see also Andersen v. Atl. Recording Corp.*, 07-934-BR, 2010 WL 4791728, *6 (D. Or. Nov. 18, 2010) (plaintiff generally "must establish that she suffered a physical touching that resulted in emotional distress").

Plaintiff fails to allege that Wright's alleged negligence resulted in any physical injury to her person. *See* FAC ¶ 136. In her response, Plaintiff explains that she seeks "general compensatory damages" in addition to "emotional distress damages," Resp. 39, but she fails to explain how that prayer for relief satisfies the rule that a plaintiff must plead and prove physical injury, loss, or harm to recover for economic losses. *See Hale*, 304 Or. at 284. Further, there is no plausible basis to conclude Wright's alleged negligence had "a perceptible physical effect" on Plaintiff or that "she suffered a physical touching" as a result of Wright's negligence. *See Chouinard*, 179 Or. App. at 515; *Andersen*, 2010 WL 4791728, *6. Wright's alleged negligence is entirely premised on his purposeful and discriminatory omissions, and not any affirmative

physical action he took with respect to Plaintiff. Accordingly, Plaintiff has failed to allege a physical injury.

Plaintiff next argues that she does not need to plead a physical injury because a special relationship was created when she, as a crime victim, reported to Wright, a police officer, that she had been raped by Lyon. Resp. 40.

The Oregon Court of Appeals has explained that, in the absence of physical injury, "economic damages . . . 'are recoverable in negligence *only if the defendant is subject to a heightened standard of care*, such as one arising out of a special relationship' or statute." *Hettle v. Constr. Contractors Bd.*, 260 Or. App. 135, 147 (2013) (emphasis in original). A "special relationship" has the following traits:

> (1) One party relinquishes control over matters, usually financial, and entrusts them to the other party[;] (2) The party with control is authorized to exercise independent judgment; (3) in order to further the other party's interests; and (4) The relationship either is, or resembles, other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship[.]

*Id.* "'In such relationships, the party in control has a heightened duty to the other party, and the other party has a right to rely on the controlling party's non-negligent performance of that duty.'" *Id.* Examples of special relationships include lawyer-client relationships, physician-patient relationships and trustee-beneficiary relationships. *See Conway v. Pacific University*, 324 Or. 231, 239-40 (1996).

Again, Plaintiff argues that a special relationship was created when she reported that she was a victim of crime to Wright, and when Wright, in turn, "presumably took the responsibility . . . to investigate the crime perpetrated against her." Resp. 40. However, the relationship between a crime victim and the police does not resemble the types of special relationships that would meet the definition set forth in *Hettle, see supra*, and Plaintiff fails to cite any Oregon case that

PAGE 36 – OPINION AND ORDER

held that a special relationship exists upon a crime victim's reporting of a crime to a police officer. Instead, Plaintiff relies on ORS § 419B.010 because that statute imposes a mandatory duty on officials to report child abuse to the appropriate agency—which Wright allegedly failed to do. Resp. 40-41. However, Plaintiff cites no authority to support her novel argument that ORS § 419B.010 creates a special relationship between child victims of sexual assault and police officers and therefore obviates the need for Plaintiff to allege a physical injury. Moreover, the Oregon Supreme Court recently held that ORS § 419B.010 "does not create statutory liability to address violations of the notification and investigatory duties" that arise under the law's mandatory reporting provisions. *See E. J. T. by & through InTRUSTment, Nw., Inc. v. Jefferson Cnty.*, 370 Or. 215, 238 (2022). Thus, it is not clear how ORS § 419B.010 could create a special relationship between Plaintiff and Wright that could give rise to tort liability while providing no cause of action for a direct violation of that statute.[9] This Court finds, therefore, that Plaintiff has failed to allege a special relationship.

In sum, under the economic loss doctrine, Plaintiff must plead a physical injury or special relationship to recovery economic damages on her negligence claim, but Plaintiff has done neither. Without pleading that she suffered a physical injury or a that she had a "special relationship" that is recognized under Oregon law for purposes of the economic loss doctrine, Plaintiff cannot state claim for negligence against defendants. *Hale*, 304 Or. at 284; *Hettle*, 260 Or. App. at 147. Thus, Plaintiff has failed stated a claim for negligence against Wright and the

---

[9] Defendants rely on *Buchler v. Oregon Corr. Div.*, 316 Or. 499, 506 (1993) and *McAlpine v. Multnomah Cnty.,* 131 Or. App. 136, 141-42 (1994) for the proposition that "no special relationship exists between the defendant jailer and the plaintiff, a member of the general public." That may be true, but those cases did not involve the economic loss doctrine, and were primarily focused on liability for the intervening criminal acts of third parties. The present case is distinguishable because the criminal acts in this case occurred *before* the alleged negligence by the city, and Plaintiff seeks to hold the City liable based on general principles of foreseeability.

City. And, based on the detailed factual allegations in the FAC, it is not plausible that Plaintiff could allege a physical injury or special relationship that would avoid the economic loss doctrine. Plaintiff's negligence claim is therefore dismissed with prejudice.

**V.    John Doe Defendants**

Plaintiff names John Does 1-10 in the caption of the FAC and alleges the following: "John Does 1-10 are individuals or entities who are unknown to Plaintiff at this time and either in privity with the named Defendants, or who are agents, principals of, or aided and abetted, the named Defendants." FAC ¶ 6. Plaintiff does not name any John Does in her claims or identify their specific conduct, and the conclusory allegations against the John Does are insufficient to state a claim for relief. Because the John Does have not been identified and have no appeared in this action, this Court *sua sponte* dismisses them without prejudice. *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) ("As a legal matter, we have upheld dismissal . . . in favor of a party which had not appeared, on the basis of facts presented by other defendants which had appeared.").

**CONCLUSION**

Wright's Motion to Dismiss (ECF 17) is DENIED as to Plaintiff's first claim for relief and GRANTED as to the remaining claims. Umatilla Defendants' Motion to Dismiss (ECF 18) is GRANTED. Plaintiff's first claim for relief against Kennedy, Huxel, and the City is dismissed WITHOUT PREJUDICE. Plaintiff's second, third, and fourth claims for relief are dismissed WITH PREJUDICE. Finally, the Court *sua sponte* dismisses the John Doe defendants WITHOUT PREJUDICE.

///

///

IT IS SO ORDERED.

DATED this 16th day of October, 2023.

_____s/ Andrew Hallman_____
ANDREW HALLMAN
United States Magistrate Judge